IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
STATESBORO DIVISION

AUTO-OWNERS INSURANCE,            *
COMPANY,                          *
                                  *
                                  *
        Plaintiff,                *
                                  *
        v.                        *          CV 622-043
                                  *
AAA DISCOUNT HOMES, LLC;          *
DELTA TRANSPORT &                 *
MANAGEMENT, INC.; DENNIS W.       *
DRIGGERS; DEWAYNE DRIGGERS;       *
and HEATHER WAY,                  *
                                  *
        Defendants.               *

_____

**O R D E R**

_____

Before the Court are Plaintiff's motion for summary judgment and amended motion for summary judgment. (Docs. 38, 54.) For the following reasons, Plaintiff's original motion is **DENIED AS MOOT** and its amended motion is **DENIED**.

## I. BACKGROUND

The Court sets out the relevant facts below from the pleadings and supporting papers.

### A. The Underlying Lawsuit

On November 4, 2021, Defendant Heather Way ("Way") filed suit against Defendants AAA Discount Homes, LLC ("AAA"), Delta Transport & Management, Inc. ("Delta"), Dennis W. Driggers

("Dennis"), and Dewayne Driggers ("Dewayne") in the Superior Court of Bulloch County, Georgia (the "Underlying Lawsuit"). (Doc. 1, ¶¶ 14-26.) The factual basis for the Underlying Lawsuit alleged manufacturing defects found in a 2021 Sunshine PR13280-2025 manufactured home (the "Home"), which was delivered and assembled by Delta, Dennis, and Dewayne (collectively, the "Delta Defendants") on Way's property at 2658 Brannen Bridge Road, Sylvania, Georgia 30467 (the "Property"). (Id.; Doc. 1-1.)

On February 26, 2021, Way contracted with AAA for the construction, delivery, assembly, setting, tie down with brick underpinning steps, and construction of both front and back porches of the Home, at the Property. (Doc. 1-1, ¶ 7.) On or about June 16, 2021, AAA, assisted by the Delta Defendants, delivered the Home to the Property and assembled it, including raising the roof, over the course of a few days. (Id. ¶ 14; Doc. 54-2, at 41, 45.) On or about June 25, 2021, Way discovered extensive water damage and mold in the Home and notified AAA and the Delta Defendants. (Doc. 1-1, ¶¶ 15, 16.) After Way gave notice to AAA and the Delta Defendants, the Home sat for a week, until on or about July 2, 2021, with no attempts to remedy the alleged water damage and mold. (Id. ¶ 17.) Then, between July 12, 2021 and July 23, 2021, AAA and its subcontractors allegedly "made careless, unsafe, and unsuccessful attempts at removing the mold and repairing the water damage." (Id. ¶ 18.) Way further alleges a spore test was

2

conducted on or about August 6, 2021, which revealed the presence of Chaetomium and Penicillium/Aspergillus in the master bedroom, kitchen, left hallway, and living room, rendering the Home uninhabitable. (Id. ¶ 19.) Way alleges the Home was "improper[ly] assembl[ed]" by the Delta Defendants, and this negligence resulted in damages for $257,688.40. (Id. ¶¶ 30-31.)

## B. The Policy and Its Exclusions

Plaintiff issued a commercial general liability insurance policy to Delta, policy number 174618-80127340-21, with an effective policy period of May 1, 2021 to May 1, 2022 (the "Policy"). (Doc. 54-1, at 2.) The Policy provides:

> We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result.

(Doc. 1-2, at 62.)  "Property damage" is defined as:

> a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

(Id. at 74-75.)

The Policy also contains several exclusions; four of which Plaintiff contends preclude coverage. (Doc. 54-1, at 2–5, 12–18; Doc. 1-2, at 65–66.)   First, the Policy contains a "damage to property" exclusion, which precludes coverage of "property damage" to "personal property in the care, custody, or control of the insured." (Doc. 1-2 at 65.)   Second, the Policy contains a "damage to your product" exclusion, which precludes coverage of "property damage" to "your product" arising out of it or any part of it. (Id.)  "Your product" is defined as "[a]ny goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by . . . You." (Id. at 75.)   Third, the Policy contains a "damage to your work" exclusion, which precludes coverages of "property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard." (Id. at 65.)   "Your work" is defined as "[w]ork or operations performed by you or on your behalf; and . . . [m]aterials, parts or equipment furnished in connection with such work or operations." (Id. at 75.)   "Products-completed operations hazard" is defined as including all "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work," except for product still in your possession or work that has not yet been completed or abandoned.   (Id. at 74.)   The Policy also explains work that may need service, maintenance, correction, repair, or replacement, but which is otherwise complete, will be

4

treated as completed. (Id.) This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor. (Id. at 65.) Fourth and finally, the Policy contains a "damage to impaired property or property not physically injured" exclusion, which precludes coverage of "property damage" to "impaired property" or property that has not been physically injured, arising out of (1) a defect, deficiency, inadequacy, or dangerous condition in "your product" or "your work" or (2) the delay or failure to perform a contract or agreement in accordance with its terms. (Id. at 66.) "Impaired property" is defined as

> tangible property, other than "your product" or "your work", that cannot be used or is less useful because: a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or b. You have failed to fulfill the terms of a contract or agreement; if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.

(Id. at 73.) This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use. (Id. at 66.)

The Policy also contains an endorsement form pertaining to fungi and bacteria, which Plaintiff contends is applicable and excludes or limits coverage. (Id. at 86-87; Doc. 54-1, at 18-19.) This endorsement provides the Policy excludes coverage for "bodily

5

injury" arising out of a "fungi or bacteria incident." (Doc. 1-2, at 86.)  "Fungi or bacteria incident" is defined as "an incident which would not have occurred, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, and 'fungi' or bacteria on or within a building or structure." (Id. at 87.)

## C. Procedural History

On June 9, 2022, Plaintiff filed this lawsuit seeking a declaratory judgment under Rule 57 of the Federal Rules of Civil Procedure and 28 U.S.C. § 2201, to declare the rights and other legal relations surrounding questions of actual controversy that presently exist between Plaintiff and Defendants. (Doc. 1, ¶ 11.) On March 31, 2023, Plaintiff moved for summary judgment. (Doc. 38.)  After Defendants filed their responses, Plaintiff filed an amended motion for summary judgment, which retracted Plaintiff's untimely notice argument but presented otherwise identical arguments to those in Plaintiff's initial motion for summary judgment (Doc. 38) and reply brief (Doc. 53). (Doc. 54.)  Because Plaintiff amended its motion for summary judgment, its original motion (Doc. 38) is **DENIED AS MOOT**.  However, because the same arguments were presented in both the original and amended motions, the Court considers the arguments presented in Defendants' responses to both (Docs. 47, 48, 58).

## II. LEGAL STANDARD

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Facts are "material" if they could affect the outcome of the suit under the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The Court must view the facts in the light most favorable to the non-moving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and must "draw all justifiable inferences in his favor." United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) (citation and internal quotation marks omitted). The Court should not weigh the evidence or determine credibility. Anderson, 477 U.S. at 255.

The moving party has the initial burden of showing the Court, by reference to materials on file, the basis for the motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). How to carry this burden depends on who bears the burden of proof at trial. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). When the non-movant has the burden of proof at trial, the movant may carry the initial burden in one of two ways — by negating an essential element of the non-movant's case, or by showing there is no evidence to prove a fact necessary to the non-movant's case. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 606-08 (11th Cir.

7

1991) (explaining <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144 (1970) and <u>Celotex</u>, 477 U.S. 317). Before the Court can evaluate the non-movant's response in opposition, it must first consider whether the movants have met their initial burden of showing there are no genuine issues of material fact and they are entitled to judgment as a matter of law. <u>Jones v. City of Columbus</u>, 120 F.3d 248, 254 (11th Cir. 1997) (per curiam). A mere conclusory statement that the non-movant cannot meet the burden at trial is insufficient. <u>Clark</u>, 929 F.2d at 608.

If the movant carries its initial burden, the non-movant may avoid summary judgment only by "demonstrat[ing] that there is indeed a material issue of fact that precludes summary judgment." <u>Id.</u> When the non-movant bears the burden of proof at trial, the non-movant must tailor its response to the method by which the movant carried its initial burden. <u>Id.</u> If the movant presents evidence affirmatively negating a material fact, the non-movant "must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated." <u>Fitzpatrick</u>, 2 F.3d at 1116. If the movant shows an absence of evidence on a material fact, the non-movant must either show the record contains evidence that was "overlooked or ignored" by the movant or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." <u>Id.</u> at 1116-17 (citation omitted). The

8

non-movant cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. See Morris v. Ross, 663 F.2d 1032, 1033-34 (11th Cir. 1981). Rather, the non-movant must respond with affidavits or as otherwise provided by Federal Rule of Civil Procedure 56.

In this action, the Clerk of Court provided Defendants notice of the motions for summary judgment, the right to file affidavits or other materials in opposition, and the consequences of default. (Docs. 39, 55.)   For that reason, the notice requirements of Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985), have been satisfied.   The time for filing materials in opposition has expired, the issues have been thoroughly briefed, and the motions are now ripe for consideration.

### III. DISCUSSION

Plaintiff moves for summary judgment on its claims that it does not have a duty to defend or indemnify the Delta Defendants in connection with the claims asserted in Underlying Lawsuit. (Doc. 54.)   The Parties disagree only on whether the Policy covers the damages for which payment is sought.   (Doc. 54, at 2-3; Doc. 47, at 4-7; Doc. 48, at 5-8; Doc. 58, at 4-12.)   Plaintiff contends it does not because (1) the Home was inherently defective as of the date of its delivery and assembly, so coverage for property damage is not afforded under the Policy; (2) there are four

exclusions under the Policy which preclude coverage; and (3) the fungi or bacteria endorsement otherwise excludes and limits coverage under the Policy.   (Doc. 54-1, at 10-19.)   The Court addresses these arguments below.

In a diversity case involving the interpretation of an insurance contract, "the Court is bound by the applicable state law governing the contract, in this case Georgia law." Giddens v. Equitable Life Assurance Soc'y of U.S., 445 F.3d 1286, 1297 n.9 (11th Cir. 2006) (citation omitted).   Under Georgia law, "[a]n insurance policy is a contract and subject to the ordinary rules of contract construction, and the parties are bound by its plain and unambiguous terms." Am. Strategic Ins. v. Helm, 759 S.E.2d 563, 565 (Ga. Ct. App. 2014) (citing Hurst v. Grange Mut. Cas. Co., 470 S.E.2d 659, 663 (Ga. 1996)).   In interpreting the terms of a policy, Georgia law requires applying "the rules of construction applicable to other contracts, and words in the policy must be given their usual and common signification and customary meaning." Collier v. State Farm Mut. Auto. Ins., 549 S.E.2d 810, 811 (Ga. Ct. App. 2001) (internal quotation marks and citations omitted).   When the language of an insurance policy is unambiguous, Georgia courts refuse to expand the rights of the parties beyond the plain terms of the policy.   See Giddens, 445 F.3d at 1297 (holding a policy will be enforced as written "[w]here the language of the contract is unambiguous and only one reasonable

10

interpretation is possible"). When some ambiguity exists, Georgia law requires a policy to be "construed in the light most favorable to the insured and against the insurer." Id. (citations omitted). Even when a policy contains some ambiguity, however, "no jury question is presented unless an ambiguity remains after application of applicable rules of construction." Alley v. Great Am. Ins., 287 S.E.2d 613, 616 (Ga. Ct. App. 1981) (citation omitted). In resolving such ambiguities, "[t]he cardinal rule of construction is to ascertain the intention of the parties." Id. (internal quotation marks and citation omitted). "'[T]he test is not what the insurer intended its words to mean, but rather what a reasonable person in the insured's position would understand them to mean.'" Giddens, 445 F.3d at 1297 (quoting W. Pac. Mut. Ins. v. Davies, 601 S.E.2d 363, 368-69 (Ga. Ct. App. 2004)).

## A. Property Damage

Plaintiff first contends there is no coverage under the Policy because the damage to the Home is not "property damage." (Doc. 54-1, at 10-12.) Plaintiff argues the Home was inherently defective as of the date of its assembly on the Property because the Delta Defendants' "improper assembly" of the Home caused the water damage. (Id. at 11.) Plaintiff concludes the water intrusion resulted from the alleged improper assembly, so the damages sustained by Way were "repair or replacement of faulty workmanship," which is not property damage under the Policy. (Id.

11

at 10.)  Way contends there is a distinction between the faulty workmanship and the subsequent water intrusion, especially when the Delta Defendants did not construct any part of the Home.  (Doc. 58, at 4—5.)  Because the water damage was to the interior of the Home, Way contends the Delta Defendants' negligent workmanship caused damage to other parts of the property not within the scope of the Delta Defendants' work, which would constitute property damage under the Policy.  (Id. at 6.)

"Property damage" is defined in the Policy as "[p]hysical injury to tangible property," or "[l]oss of use of tangible property that is not physically injured."  (Doc. 1-2, at 74-75.) "'[P]roperty damage,' as that term is used in the standard [commercial general liability ("CGL")] policy, necessarily must refer to property that is non[-]defective, and to damage beyond mere faulty workmanship."  Taylor Morrison Servs., Inc. v. HDI-Gerling Am. Ins., 746 S.E.2d 587, 591 (Ga. 2013).  Under Georgia law, a claim for the repair or replacement of faulty workmanship is not covered by a standard CGL policy because such a claim is not a claim for "property damage."  Id. at 591 n.10.  However, negligent or defective construction resulting in damage to an otherwise non-defective component of the project may constitute "property damage."  Id.  Thus damage to other parts of the property as a result of negligent workmanship would constitute "property damage."  Id.

12

Here, the Delta Defendants did not construct any part of the interior of the Home, nor did they manufacture or sell the Home. (Doc. 54-2, at 43; Doc. 48, at 6; Doc. 47, at 5.)   Rather, their role was to transport the two halves of the Home to the Property and assemble it there.   (Doc. 56, at 5; Doc. 54-2, at 43; Doc. 58, at 8.)   Plaintiff has not shown the Home was defective before the Delta Defendants' assembly, nor have they shown the resulting water damage was merely a repair or replacement of the Delta Defendants' assembly work.   The fact the property damage may have resulted from defective or negligent construction by the Delta Defendants does not place all this damage outside the term "property damage." SawHorse, Inc. v. S. Guar. Ins., 604 S.E.2d 541, 546 (Ga. 2004). Without more to show the Home was inherently defective, the Court cannot find the resulting damage was not "property damage" under the Policy.   Thus, Plaintiff has not carried its burden to show summary judgment is proper on this issue.

## B. Application of the Policy's Exclusions

Plaintiff also contends four exclusions under the Policy preclude coverage: (1) a "damage to property" exclusion, which precludes coverage of "property damage" to "personal property in the care, custody, or control of the insured"; (2) a "damage to your product" exclusion, which precludes coverage of "property damage" to "your product" arising out of it or any part of it; (3) a "damage to your work" exclusion, which precludes coverage of

"property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard"; and (4) a "damage to impaired property or property not physically injured" exclusion, which precludes coverage of "property damage" to "impaired property" or property that has not been physically injured, arising out of a defect, deficiency, inadequacy, or dangerous condition in "your product" or "your work" or the delay or failure to perform a contract or agreement in accordance with its terms. (Doc. 54-1, at 2-3 (citing Doc. 1-2, at 65-66).)

These exclusions are often called "business risk" exclusions. SawHorse, 604 S.E.2d at 544. The purpose of "business risk" exclusions is to ensure liability for faulty or defective workmanship is properly allocated between the insurer and the insured, and "[t]he principle behind such exclusions is based on the distinction made between two kinds of risk incurred by a contractor." Glens Falls Ins. v. Donmac Golf Shaping Co., 417 S.E.2d 197, 200 (Ga. Ct. App. 1992). "The first is the business risk borne by the contractor to replace or repair defective work to make the building project conform to the agreed contractual requirements"; this is the type of risk excluded from coverage under a typical CGL policy. Id. (citation omitted). "The second is the risk that the defective or faulty workmanship will cause injury to people or damage to other property. Because of the potentially limitless liability associated with this risk, it is

the type for which CGL coverage is contemplated." Id. (citation

omitted).  Put differently,

> [w]hile it may be true that the same neglectful
> craftsmanship can be the cause of both a business expense
> of repair and a loss represented by damage to persons
> and property, the two consequences are vastly different
> in relation to sharing the cost of such risks as a matter
> of insurance underwriting.  The risk intended to be
> insured is the possibility that the goods, products or
> work of the insured, once relinquished or completed,
> will cause bodily injury or *damage to property other
> than to the product or completed work itself,* and for
> which the insured may be found liable. The insured, as
> a source of goods or services, may be liable as a matter
> of contract law to make good on products or work which
> is defective or otherwise unsuitable because it is
> lacking in some capacity. *This may even extend to an
> obligation to completely replace or rebuild the
> deficient product or work. This liability, however, is
> not what the coverages in question are designed to
> protect against.*

Sapp v. State Farm Fire & Cas. Co., 486 S.E.2d 71, 75 (Ga. Ct.

App. 1997) (emphasis in original); see also Elrod's Custom Drapery

Workshop, Inc. v. Cincinnati Ins., 371 S.E.2d 144, 145 (Ga. Ct.

App. 1988) ("[The] purpose of this comprehensive liability

insurance coverage is to provide protection for personal injury or

for property damage caused by the completed product, but not for

the replacement and repair of that product" (internal quotation

marks and citation omitted)).

Plaintiff contends the damages sought by Way are the first

type of risk and are thereby excluded under the Policy.  (Doc. 54-

1, at 11-17.)  Defendants argue the damages were not part of the

Delta Defendants' workmanship and therefore fall under the second

type of risk, which the Policy covers.  (Doc. 47, at 4-7; Doc. 48, at 5-8; Doc. 58, at 7.)   The Court now analyzes whether these exclusions apply to the underlying claims asserted by Way against the Delta Defendants.

1. <u>Damage to Property</u>

The Policy precludes coverage of "property damage" to "personal property in the care, custody, or control of the insured."  (Doc. 1-2, at 65.)   Plaintiff contends the Home was "personal property" in the Delta Defendants' "care, custody, and control" at the time of the alleged damage and water intrusion. (Doc. 54-1, at 12-15.)   Plaintiff relies on Georgia caselaw and argues a clear bailment was created, which gave the Delta Defendants complete control over the Home regardless of whether Way could enter the Home while the Delta Defendants were working on it.  (<u>Id.</u> at 13-14; Doc. 56, at 2.)   Defendants contend the Home was never in the complete dominion of the Delta Defendants, so no bailment was created; thus, the Home was not in their "care, custody, and control."  (Doc. 47, at 5; Doc. 48, at 6; Doc. 58, at 7-8.)

> The "care, custody or control" language at issue is a term of art whose meaning varies depending on the underlying type of risk being insured.  The cases applying this language may be viewed on a continuum.  In cases dealing with real property, courts have been reluctant to find care, custody or control in the hands of insureds who were hired to work on only a portion of a structure.  At the other end of the continuum, when

16

there is a clear bailment of chattels, care, custody or control is nearly always found.

Tifton Mach. Works, Inc. v. Colony Ins., 480 S.E.2d 37, 39 (Ga. Ct. App. 1996) (citing Royal Indem. Co. v. Smith, 173 S.E.2d 738, 739 (Ga. Ct. App. 1970)).

The Home, a mobile home not yet been affixed to the real property, constitutes personal property and not real property. Crowder v. Larson, 513 S.E.2d 771, 772 (Ga. Ct. App. 1999) ("[A] mobile home that is not permanently affixed to the real estate is not part of the real estate or an improvement thereto, but is an item of personal property separate and apart from the real property on which it sits." (citations omitted)).  While Georgia courts agree the exclusion generally applies to bailments of personal property, it is unclear whether a bailment existed here.  Tifton, 480 S.E.2d at 39 (citing Royal, 173 S.E.2d at 739).  "A bailment is a delivery of goods or property upon a contract, express or implied, to carry out the execution of a special object beneficial either to the bailor or bailee or both and to dispose of the property in conformity with the purpose of the trust." O.C.G.A. § 44-12-40.  "[T]o create a bailment, express or implied, there must be an actual or constructive delivery of the goods with actual or constructive possession in the bailee, exclusive and independent of the bailor and all other persons."  Cesaroni v. United States, 624 F. Supp. 613, 620 (S.D. Ga. 1985), aff'd, 780 F.2d 1031 (11th

17

Cir. 1985) (citing Davidson v. Ramsby, 210 S.E.2d 245, 248 (Ga. Ct. App. 1974)).   Indeed, Georgia law requires complete dominion at all times over property for a bailment relationship to exist. Owners Ins. v. Smith Mech. Contractors, Inc., 683 S.E.2d 599, 601 (Ga. 2009).

Plaintiff argues the Delta Defendants had a clear bailment of the Home.   (Doc. 54-1, at 14.)   Plaintiff claims the Delta Defendants had exclusive control over the Home during the delivery and assembly process and only their employees were permitted to access it at that time.  (Id.)  Plaintiff concedes Way would have had access to the Home but argues the Delta Defendants would not have permitted Way access when it was being put together.  (Id.) Based on these facts, Plaintiff concludes the Delta Defendants had a bailment with respect to the Home, meaning the Home constituted "[p]ersonal property in the care, custody or control of the insured."   (Id.)   Way, however, emphasizes the Home was located on Way's real property at the time of the damage, and Way had access to the Home and ability to halt its assembly.  (Doc. 58, at 8.)  For these reasons, the Court determines there is a question of fact whether the Delta Defendants had complete dominion over the Home.   Therefore, the Court cannot say there was a "clear bailment of chattels."

In close cases such as this where a bailment has not indisputably been created, the Court finds persuasive and adopts

18

the reasoning and approach to construing the meaning of "care, custody, and control" over personal property set out in Royal, 173 S.E.2d 738, and Tifton, 480 S.E.2d 37.   In Royal, the Parties debated whether a tank, including its affixed interior mechanism, the plaintiff had been hired to paint was under the plaintiff's "care, custody, and control," and thus excluded from coverage under the insurance policy's exclusions.   173 S.E.2d at 739.   The interior mechanism was damaged when the plaintiff moved it to paint part of the tank.   Id. at 738.   Rather than determining whether the tank and interior mechanism were real property or personal property subject to a created bailment, the Royal court opined "the better approach [was] to examine the purposes of the exclusion in the policy and determine whether this [was] the type of risk against which the insurance company had not calculated its premium."   Id. at 740.   The Royal court explained these exclusions were designed to "eliminate[] the possibility of the insured making the insurance company a guarantor of its workmanship" and avoid the moral hazard of a policy covering damage to "property with reference to which the insured might benefit by falsely claiming that it had been damaged by 'accident' or by exaggerating the loss."   Id. (citation omitted).   The Royal court further stated, "[i]t is difficult to conceive how the question of moral hazard could arise with reference to property belonging solely and unconditionally to others."   Id. (citation omitted).   Considering

19

the exclusion in the light of its purpose, the Royal court concluded "only the walls of the tank which [plaintiff] was hired to paint, and not the interior mechanism, was in the care, custody or control of plaintiff." Id. at 741. However, the Royal court theorized the exclusion would have applied had the paint job "been so poor that the tank rusted within a few months and caused a structural collapse," because workmanship, rather than accident, would be involved. Id. at 740.

In Tifton, an employee of the plaintiff damaged a client's hydraulic press, which the plaintiff had been contracted to move from one end of a client's warehouse to another and install it. 480 S.E. 2d at 38. Again, the Tifton court emphasized the importance of the purpose of the "care, custody, and control" language in "borderline cases" when determining whether the exclusion applied. Id. at 39. While the purpose of avoiding a guarantee of workmanship is a "perfectly legitimate purpose for an 'accident' policy, ... [we have rejected efforts] to extend the meaning of workmanship to any contact with property during the course of a job [because the result] is to virtually wipe out the primary coverage." Id. (quoting Royal, 173 S.E.2d 738). Moreover, the Tifton court found the plaintiff reasonably could have expected coverage on activities related to machine installation because of the type of insurance purchased − a machine installation rider. Id. The Tifton court found the insurer's construction of the

20

"care, custody, or control" clause would destroy coverage under the policy because, as the Tifton court queried, "[h]ow could an insured ever install a machine without taking control of it?" Id. at 39-40.  The Tifton court emphasized the language of the policy must be read in the context of the factual circumstances.  Id. at 40 (citation omitted).  Because the insurer failed to satisfy its burden of drafting clear and precise language revealing the reach of the policy, the Tifton court found the policy ambiguous and reversed the lower court's grant of summary judgment.  Id.

Here, like in Royal and Tifton, the purpose of the exclusions is to "eliminate[] the possibility of the insured making the insurance company a guarantor of its workmanship."  Royal, 173 S.E.2d at 740.  Also as in those cases, here there is no clear bailment, so the Court must determine, based on policy rationale, where on the continuum of "control" the Delta Defendants' relationship to the Home falls.  On the one hand, the water damage due to the Delta Defendants' alleged negligent assembly could be considered analogous to the court's theorized poor paint job resulting in rust and total collapse of the tank in Royal.  On the other hand, the Delta Defendants were hired to deliver the home and assemble it on the Property, much like how the plaintiff in Tifton was contracted to move a machine and install it.  Thus, like in Tifton, how could the Delta Defendants ever move and assemble manufactured homes without taking "control" of them?

21

Interpreting the care, custody, or control language of the Policy to exclude coverage under this circumstance could result in illusory coverage. In interpreting policy language, the Court must consider "'what a reasonable person in the insured's position would understand [the policy terms] to mean.'" Giddens, 445 F.3d at 1297. To avoid the potential creation of illusory coverage and interpreting the Policy terms in the insured's favor, the Court declines to find that delivering and assembling the Home gave the Delta Defendants' exclusive control over it such that they are subject to the "care, custody, or control" exclusion of the Policy. For these reasons, summary judgment is improper on the issue of whether this exclusion precludes coverage.

    2. Damage to Your Product

    The Policy also precludes coverage of "property damage" to "your product" arising out of it or any part of it. (Doc. 1-2, at 65.) "Your product" means "[a]ny goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by . . . You." (Id. at 75.) Plaintiff contends the Home was the Delta Defendants' "product" because they "handled" the Home in delivering and assembling it. (Doc. 54-1, at 15-16.) Defendants argue the Home does not constitute "your product" because the Delta Defendants did not construct or sell manufactured homes. (Doc. 58, at 8; Doc. 47, at 5; Doc. 48, at 6.) Defendants also argue the recovery Way sought was not for "negligent

22

workmanship," but damage to the Home itself caused by water intrusion and mold damage. (Doc. 58, at 8.)  This damage allegedly resulted from the Delta Defendants' negligent workmanship, but Defendants assert was not the work or product itself. (Id.)  As a result, Defendants contend any damages Way sought were not intended to redress the work or product of the Delta Defendants. (Id.)

The Court finds the Home does not constitute "your product" under the Policy because there is ambiguity concerning the meaning of "handled."  Plaintiff only contends the Home falls under the definition of "your product" because the Delta Defendants "handled" the Home.  (Doc. 54-1, at 15.)  However, Defendants assert, and Plaintiff does not dispute, the Home was not constructed or sold by the Delta Defendants. (Doc. 58, at 8; Doc. 47, at 5; Doc. 48, at 6.)  When interpreting contracts, words should be given the meanings ordinarily ascribed, and absurd results should be avoided.  Collier, 549 S.E.2d at 811.  The context in which the words appear is highly relevant to their interpretation. Ace Am. Ins. v. Wattles Co., 930 F.3d 1240, 1254 (11th Cir. 2019) ("Georgia courts also rely on other contextual clues when attempting to discern the intention of the parties").  Indeed, when words appear in a list, it indicates they have some quality in common and should be given related meanings.  Id. at 1258-59.

Here, the word "handled" appears in a list with the words manufactured, sold, distributed, or disposed. (Doc. 1-2, at 75.) The words appearing alongside "handled," all require significant control over the production of the Home. If handled is given a meaning related to the words in the list, handled could be interpreted to require more than just delivery and assembly. Plaintiff fails to distinguish between how "your product," if handled encompasses delivering and assembling the Home, would differentiate from the later used phrase "your work," which is subject to a separate policy exclusion. Indeed, the Court must consider all four corners of the contract and interpret it in a way to avoid redundancies. Garrett v. S. Health Corp. of Ellijay, Inc., 739 S.E.2d 661, 667-68 (Ga. Ct. App. 2013) (citations omitted) ("[I]t is a well-established rule of contract construction that a court should avoid an interpretation of a contract which renders any of its terms meaningless or mere surplusage.").

In cases such as this, "where the language contained in an insurance policy is susceptible to two or more [reasonable] constructions, the one most favorable to the insured will be adopted." Alley, 287 S.E.2d at 616 (citations omitted). Because the word "handled" could be interpreted under the language of the Policy as requiring more than simply delivering and assembling the

24

Home, the Court finds the term's meaning ambiguous and the "your product" exclusion inapplicable.

### 3. Damage to Your Work

The Policy also excludes "property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard." (Doc. 1-2, at 65.) "Your work" means work or operation performed by insured or on insured's behalf. (Id. at 75.) Plaintiff contends the improper assembly performed by the Delta Defendants exclusively on the Home constitutes "your work." (Doc. 54-1, at 16-17.) Plaintiff argues the "your work" exclusion, like the other business risk exclusions, is designed to exclude coverage for defective workmanship by the insured builder causing damage to the construction project itself. (Id. at 16.) Thus, Plaintiff concludes, because the alleged improper assembly caused water intrusion, making the Home uninhabitable, this was damage caused by the insured's work, which was damage to the product or completed work itself bringing the damages within the scope of the "your work" exclusion. (Id. at 16-17.) But Defendants contend this exclusion is meant to exclude only the particular part of the property on which work is being performed by insured. (Doc. 48, at 7; Doc. 47, at 6; Doc. 58, at 10.) Because Way is not seeking compensation for reassembly of home, which Defendants concede would fall under exclusion, but instead seeks damages for water intrusion and other damages caused

by water intrusion, Defendants argue this constitutes damage to another part of the Home.   (Doc. 58, at 10.)   Therefore, in Defendants' eyes, the damages do not fall under the "your work" exclusion.  (Id.)

As stated, "business risk" exclusions, such as the "your work" exclusion, "are designed to exclude coverage for defective workmanship by the insured causing damage to the project itself." Canal Indem. Co. v. Blackshear Farmers Tobacco Warehouse, Inc., 490 S.E.2d 129, 132 (Ga. Ct. App. 1997) (citation omitted). However, "[t]he risk that defective or faulty workmanship will damage other property is the type of risk for which [CGL] coverage is contemplated." Id. (citation omitted and alterations adopted). In Canal, a subcontractor's partial roof repair failed, and water leaked into the building causing damage.  Id. at 131.   The subcontractor's insurance policy contained a "your work" exclusion like the one here.  Id.  While not covered for damage to the repaired roof, the subcontractor was covered for damage to the rest of the roof and to stored tobacco within the building.  Id. at 132.

In another Georgia case, SawHorse, the contractor failed to install support beams when adding a second story to a house, which allegedly damaged both the new addition and the existing structure of the original one-story house.  604 S.E.2d 541, 544.   In reversing the lower court's grant of summary judgment for the

insurer, the SawHorse court held, although damage to the new addition was not covered, damage to the existing structure was covered. Id. at 545-46. The SawHorse court remanded for a factual determination of "whether - or to what extent - the allegedly defective workmanship caused damage to the construction project itself, a business risk borne by the contractor, or to other property, a risk covered by [the CGL]." Id. at 546.

The same reasoning in Canal and SawHorse applies here: the Policy does not cover the costs to replace the defective workmanship — the defective assembly of the Home — but covers the costs to repair damage to other property caused by the defective workmanship. As in those cases, there is a factual question here of "whether — or to what extent — the allegedly defective workmanship caused damage to the construction project itself, a business risk borne by the contractor, or to other property, a risk covered by [the Policy]." SawHorse, 604 S.E.2d at 546. In this case, the Delta Defendants delivered the Home to the Property and over the course of a few days assembled the Home, including joining the two halves and raising/connecting the roof. (Doc. 56, at 5; Doc. 54-2, at 43.) The Delta Defendants did not perform any work on interior assembly. (Doc. 54-2, at 43.) After assembly, Way discovered extensive water damage and mold in the Home, which she reported, and AAA and its contractors attempted, unsuccessfully, to remove the mold and water damage. (Doc. 54-2,

at 7-8; Doc. 1, ¶¶ 15-19.)  Way alleged the mold and water damages to the Home resulted from the Delta Defendants' improper assembly of the Home.  (Doc. 54-2, at 8; Doc. 1, ¶¶ 30-31.)  There are no allegations the damages happened along seams where the Home was assembled, that the water damage resulted from repairs of the Delta Defendants' assembly, or that the repairs to the Home involved correcting or repairing the "work" the Delta Defendants undertook – joining the two halves and raising the roof.  Based on the facts before the Court, it is unclear whether the damages claimed were to the part of the Home the Delta Defendants worked to assemble the Home or whether the damages were to other property damaged by the faulty assembly.  Thus, Plaintiff has not carried its burden to show this exclusion applies, and summary judgment is inappropriate on this issue.

### 4. Damage to Impaired Property

Next, the Policy precludes coverage of "property damage" to impaired property or property that has not been physically injured, arising out of: (1) a defect, deficiency, inadequacy, or dangerous condition in "your product" or "your work"; or (2) a delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.  (Doc. 1-2, at 66.)  Impaired property is defined as tangible property that cannot be used or is less useful because it incorporates "your product"

or "your work" that is known or thought to be defective, deficient, inadequate or dangerous.   (Id. at 73)

Plaintiff contends the Home falls under the definition of "impaired property" because "[i]t is tangible, has been alleged to be uninhabitable, and incorporates" "your product" or "your work" of the Delta Defendants.  (Doc. 54-1, at 17.)  Moreover, according to Plaintiff, "'impaired property' must be capable of being 'restored to use by the repair, replacement, adjustment or removal of "your product" or "your work."'"  (Id.)  Plaintiff argues the Delta Defendants' work in assembling the Home can be restored by the repair of its work, and as it is alleged in the Underlying Lawsuit that repair attempts were made.  (Id.)  Plaintiff further posits the exception to this exclusion does not apply because the water intrusion was not a "sudden and accidental physical injury." (Id.)  Defendants contend the "impaired property" exclusion should not apply because it is ambiguous.  (Doc. 47, at 7; Doc. 48, at 8.)  Way also argues the exclusion does not apply because she "is seeking to recover for damages to the manufactured home caused by the negligence of the Delta Defendants but which are outside of the scope of work of said Defendants."  (Doc. 58, at 12.)

As discussed above, the scope of "your work" is debated by the Parties, and the Court has already found Plaintiff has not carried its burden to establish "your work" constituted not only the delivery and assembly of the Home, which both Parties concede

is "your work," but also included the attempted repair of the subsequent water damage and mold growth in the Home. Thus, Plaintiff has not shown the damages sought were to address the defective workmanship rather than to redress damages to other parts of the Home. Because Way alleged the mold caused by water damage — and not the Home's assembly — made the Home uninhabitable, Plaintiff has not shown the Home constituted "impaired property." Thus, Plaintiff has not carried its burden to show this exclusion is applicable and summary judgment is improper on this issue.

## C. Fungi Bacteria Exclusion

Lastly, the Policy contains a fungi and bacteria endorsement, which excludes coverage for "bodily injury" arising out of a "fungi or bacteria incident." (Doc. 1-2, at 86–87.) "Fungi or bacteria incident" is defined as "an incident which would not have occurred, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, and 'fungi' or bacteria on or within a building or structure." (Id. at 87.) Plaintiff contends this endorsement excludes or limits coverage to the extent any such damages arose out of a "fungi or bacteria incident." (Doc. 54-1, at 18–19.) Plaintiff, however, concedes the Underlying Lawsuit has not alleged any damage because of "bodily injury." (Id. at 18.) Defendants do not respond to Plaintiff's arguments relating to the fungi and bacteria endorsement. (See Docs. 47, 48, 58.)

While the failure to respond to arguments in a motion for summary judgment indicates no opposition, "summary judgment cannot be granted by default even if there is a complete failure to respond to the motion." FED. R. CIV. P. 56(e) advisory committee's note to 2010 amendment.   The district court "must consider the merits of the motion." <u>United States v. One Piece of Real Property Located at 5800 SW 74th Ave.</u>, 363 F.3d 1099, 1101 (11th Cir. 2004) (citation omitted).   Plaintiff's argument lacks merit.   Way has not alleged any damages because of "bodily injury," as Plaintiff has conceded.   (Doc. 54-1, at 18.)   Thus, Plaintiff has not met its initial burden to show Way's allegations fall within the Policy's fungi or bacteria endorsement. Plaintiff's motion for summary judgment on the ground that the fungi or bacteria endorsement applies is therefore denied.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff's original motion for summary judgment (Doc. 38) is **DENIED AS MOOT**, and Plaintiff's amended motion for summary judgment (Doc. 54) is **DENIED**.   The case shall proceed to trial in due course.

**ORDER ENTERED** at Augusta, Georgia, this ___ day of March, 2024.

_____
J. RANDAL HALL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA